## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-474 BAH** |
| v. | : | |
| | : | |
| DAWN MUNN | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Dawn Munn to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Dawn Munn, a 57-year-old licensed vocational nurse, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

Dawn Munn pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of 30 days'

---

[1] Although the Statement of Offense in this matter, filed on May 13, 2022, (ECF No. 81 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

incarceration is appropriate in this case because (1) the defendant and her family observed tear gas deployed prior to entering the Capitol building, but chose to enter anyway; (2) the defendant and her family entered the Capitol through the Senate wing door broken windows at approximately 2:25 p.m., approximately 12 minutes after the initial breach of the building; (3) five minutes after entering, between approximately 2:30 and 2:36 p.m., the defendant and her family made their way through the Crypt and into the Visitor's Center area where she and her family witnessed other individuals physically engaging with law enforcement;[2] (4) despite witnessing officer and rioter confrontations, including being incidentally knocked down during one, defendant and her family continued to roam the Capitol building until finding their way to Room S-145, a Senate conference room, where they spent time observing a large number of rioters and officers gathered to the west of the building; (5) after spending approximately 52 minutes inside the Capitol, defendant and her family finally left the building at 3:17 p.m.; and (6) in social media posts in the days following January 6, defendant bragged privately and publicly to other users about being in the Capitol building and having stormed the building.

The Court must also consider that Munn's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull

---

[2] The government acknowledges that during this period of time the defendant and her family also appear to have stopped to pick up trash on the floor.

this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of her fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Munn's crime support a sentence of 30 days' imprisonment.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 81 (Statement of Offense), at 1-6. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Munn's conduct and behavior on January 6.

### *Defendant Dawn Munn's Role in the January 6, 2021 Attack on the Capitol*

Defendant Dawn Munn, her husband, son, and three of her daughters, drove from their home in Borger, Texas to Washington, D.C., to attend a rally on January 6, 2022 for then-president, Donald Trump. *See* ECF No. 96 at ¶ 14. After the rally, Munn and her family joined the crowds and walked towards the United States Capitol. *Id*. at ¶ 15. Before entering the Capitol, Munn and her family walked past bike rack fencing that had been pushed aside and green plastic fencing that had been knocked down and rolled up. *Id.* at ¶ 16. Notably, Defendant Munn and her family were exposed to tear gas used by law enforcement on the grounds and inside the Capitol and Defendant

Munn knew that the tear gas was being employed to keep rioters like herself outside of the building. *Id*. ¶ 17.

Despite the deterrent, the defendant and her family continued towards the Capitol building. The U.S. Capitol was first breached at 2:13 p.m. at the Senate wing doors by rioter Michael Sparks who jumped through the window over the broken glass as depicted in Figure 1:



*Figure 1*

Twelve minutes after the entry depicted above, Munn and her family entered the U.S. Capitol through the broken Senate door window on the right side of Figure 1. Dawn Munn was the fourth of her five family members to climb through the window. She is seen in a black jacket with the hood up and wearing sunglasses on the right side of Figure 2 circled in red. Her husband, Thomas Munn, is seen in the red sweatshirt helping her through the window.

4



*Figure 2 (Screenshot from ECF No. 64, Exhibit 5)*

The family made their way to the Crypt area and moved on to the Visitor's Center.[3]  *Id.*

¶ 22.  Defendant Munn is circled in red in Figures 3 (the Crypt) and 4 (the Visitor's Center).

---

[3] It does appear from the video that the family helped pick up trash while in the Visitor Center area.



*Figure 3 (Screenshot from ECF No. 64, Exhibit 2)*



*Figure 4 (Screenshot from ECF No. 64, Exhibit 7)*

The family then made their way to a Senate conference room, S-145, where rioters outside could be seen from the window pushing up against a large police line. Room S-145 is a Senate conference room and is considered a sensitive area of the Capitol Police.  The family spent at least a few minutes in the room watching law enforcement and officers on the west terrace. Figure 5 depicts defendant's daughter, Kristi Munn, recording the law enforcement and crowd from inside S-145. *Id*. ¶ 24.



*Figure 5 (Screenshot from ECF No. 64, Exhibit 8)*

Finally, Defendant Munn and her family exited the Capitol through a separate set of broken windows next to the Senate wing doors at approximately 3:17 p.m.  *Id*. ¶ 25. Munn is seen in Figure 6, circled in red, just before exiting the Capitol building through the broken window.[4]

---

[4] It does appear, based on the video in Exhibit 6, that officers may have directed the family to exit through the broken window.



*Figure 6 (Screenshot from ECF. 64, Exhibit 6)*

In total, Dawn Munn and her family spent over 50 minutes inside of the Capitol. Defendant Munn, and each of her family members, have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and that they paraded, demonstrated, or picketed inside the building.

*Social Media Posts*

On January 2, 2021, Dawn Munn commented on Facebook, "Nothing will stand in our way from taking our country back...DC bound!!!"   On January 3, 2021, she posted Figure 7 and included the caption, "Monday we load up as a family to stand for all now and future generations to come!"

In the event that the election is overturned and Trump is re-inaugurated for a second term, we know you will declare war. We know you wll burn down cities. We know you will kill people, We know that you may even do things like start secession movements in your own states.

We also know what you have planned for us during a Biden-Harris administration. You've told us in so many words, so many times. We have decided we would rather endure the former with Trump in office, than endure the latter with Biden and Harris. We think that badly of you that we would prefer that. I don't think many of you get that.

So threatening us with war is acceptable to us. We'd rather have that than what you have planned for the country. And it's frankly a very easy choice.

*Figure 7 (ECF. No. 64, Exhibit 21)*

Defendant Munn also posted Figure 8 on January 3, 2021.



*Figure 8 (ECF. No. 64, Exhibit 24)*

After January 6, Defendant Munn and her family traded numerous photos amongst themselves and others on Facebook.  *See* ECF No. 64, Exhibits 32-37, 46-48, 57-58, 78-82. Further, in a Facebook conversation with another Facebook user on January 6, 2021, Dawn Munn bragged, "We went in and stormed capital!" ECF No. 96 at ¶ 23. In a conversation with a different Facebook user, also on January 6, 2021, she wrote, "We were in capital!...I do mean IN the building!" *Id*. In another Facebook conversation the same day, this time with her daughter, Kelsi Munn, who was not at the Capitol with the rest of the family, Dawn Munn wrote, "We stormed

in…went in and out broken window!" Kelsi replied, "Who broke a window??...That's way cool tho." Dawn Munn answered, "They barricaded the door so they took out window…climbed in!!!" *Id*. at ¶ 24.   In another private Facebook message, Defendant Munn referenced a physical altercation writing, "I got body checked by coo and sent flighing!!!! Knee is pretty color!!!"

*Munn's Post-arrest Interview with the FBI*

On July 13, 2021, seven months after she had been at the Capitol building, Munn gave a voluntary post-arrest interview to the FBI. During the interview, she admitted driving to Washington, D.C. with her family for the rally because they "believed the election was stolen." They stayed in a hotel in Virginia the night before and then took the train into Washington, D.C. to attend the rally.  The family attended the rally and then walked toward the Capitol building. She, like her other family members, admitted to seeing tear gas prior to entering the building.  She explained that the gas "enraged" the crowd and, but for the gas, "they probably wouldn't have gone any further."

She claimed that she and her family were "guided in" the building by a well-dressed man and admitted to climbing through a window to get in.  She claimed that everyone was polite. She also claimed that she observed an officer "trash" a bathroom by throwing a garbage can, ripping a towel dispenser off the wall, and kicking bathroom stall doors. She also said that at one point she was knocked to the ground and bruised her knee when she got in the way of an officer and a protester who were in a physical altercation near the Visitor's Center.

Defendant Munn said that most people were peaceful and only a few were trying to damage property.  She also referenced being in a conference room (presumably S-145), and explained that someone tried to damage a painting and pulled out drawers of a dresser and her daughter, Kristi, yelled at the person not to do so. After the family left the Capitol and returned to their hotel, they

watched the news.  Defendant Munn said the media made it look like, "Beirut," and they had turned it "into a bunch of lies."  Finally, at the time she was interviewed in July of 2021, when asked if she would do go into the Capitol again if given the opportunity, Defendant Munn responded, "Most definitely."

*The Charges and Plea Agreement*

Dawn Munn now faces sentencing on a single count of violating 40 U.SC. § 5104(e)(2)(D). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### III.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of the 30 days' incarceration and a three-year term of probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Munn's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Munn personally engaged in violence or destruction, she would be facing additional charges

and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Munn is therefore not a mitigating factor in misdemeanor cases.

Munn entered the Capitol building approximately 12 minutes after it was first breached through a broken window next to the Senate Wing doors. The fact that she and her family entered the building through a broken window was an obvious sign of violent entry.  Indeed, Munn and her family would have had to jump down on to a pile of shattered glass on the ground as they helped each other through the damaged window frame. They all would have also heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. The entire family was aware that tear gas had been deployed, both outside and inside the building. Yet the family didn't stop outside, or in the hallway where they entered.  Instead, they found their way to the Crypt, to the Visitor's Center, and to a Senate conference room on the west side of the building.  They witnessed physical violence between officers and protestors and Defendant Munn even inadvertently became a part of it. Of particular note and aggravating here, although the entire Capitol building was a restricted area that day, a Senate conference room like S-145 is considered particularly sensitive as it is not an area where the general public would typically visit.  While Munn doesn't appear to have taken any particular action in the conference room (and her daughter may have even stopped some destruction), it is still notable that she spent time in this area.

In total, the family spent over 50 minutes inside the Capitol building, witnessed and became a part of altercations between other rioters and law enforcement officers, and spent time in a sensitive area of the building.  They eventually left the building through the same area they entered,

albeit through a different set of broken windows.[5]   After the fact, Munn posted to social media, both privately and publicly, perpetuating misinformation about the reality of the events of January 6 at the Capitol building. Even in her post-arrest interview, Munn was clear that the media had portrayed the events as far more violent than they actually were that day.  Munn also exhibited no remorse over seven months after the attack stating that she absolutely would go inside the Capitol again if given the chance.

Finally, the government recognizes that some other rioters engaged in more aggravating conduct by engaging in extensive planning, membership in organized groups etc.  But the possibility that Munn could have done something worse does not change the fact that what she did do that day establishes a need for incarceration. Her baseline conduct, breaching the Capitol, is serious: the riot could not have succeeded without the efforts of even more minor contributors like Munn.

Accordingly, the nature and the circumstances of this offense establish 30 days' incarceration and probation are appropriate in this matter.

### B.  The History and Characteristics of Dawn Munn

As set forth in the PSR, Munn has no criminal history ECF No. 96 at ¶¶ 49-50.  Defendant Munn is married, and has eight children, four of whom she brought with her to Washington, D.C. on January 6. She is currently a licensed vocational nurse and has remained compliant with her pretrial conditions of release.

---

[5] There is at least some video evidence that supports the Munn family's claim that officers directed them out the broken window because of the large crowd trying to leave the building at the time.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

CR-00041 Tr. 10/13/2021 at 37). *See also United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.")

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Munn's conduct on January 6, entering the Capitol Building through a broken Senate Wing window, parading through the Crypt, the Visitor's Center, a Senate Conference room, witnessing physical violence, remaining inside the Capitol for 52 minutes, and further perpetuating misinformation about the events of January 6 and showing no real remorse for her actions that day clearly demonstrate the need for specific deterrence for this particular defendant in the form of 30 days' incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence Munn based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot. Although those like Defendant Munn convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[8] *See United States v. Anna*

---

[7] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Defendant Munn has pleaded guilty to Count 4 of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the

Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who behaved similarly in terms of their entry, their behavior, their time in sensitive places within the Capitol, and the overall time spent inside.

In *United States v. Jennifer Heinl*, 21-cr-370 (EGS), the defendant pleaded guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with her breach of the Capitol building on January 6, and Judge Sullivan sentenced her to 21 days of incarceration and 36 months of probation. Heinl witnessed clashes with law enforcement outside the Capitol before she went inside and, like Munn, was made aware of the potential for violence yet nonetheless chose to enter the Capitol through the same breached Senate Wing doors within ten minutes of the initial breach, and remained in the Capitol

for approximately 47 minutes.  Gov. Sentencing Mem., *Heinl*, 21-cr-370, ECF No. 35 at 2, 13-14. Unlike Munn, she also made multiple false statements to the FBI during a pre-arrest telephone interview, though like Munn, Heinl showed a lack of remorse during a post-plea interview with the FBI. *Id*.  Further, there was no evidence that Heinl entered any sensitive spaces while she was inside the Capitol building.

Looking to defendants who did enter sensitive areas, in *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pleaded guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room, a sensitive area. Judge Boasberg sentenced each defendant to 45 days' incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright*, No. 21-cr-72 (CRC) (30 days incarceration). This Court sentenced a defendant who found his way inside Senator Jeff Merkley's office, yelled at officers, and entered the Capitol twice for a total of 23 minutes, to 30 days of intermittent confinement and 36 months' probation.  *United States v. Lucard*, No. 21-cr-87 (BAH). Although Munn did not make it quite as far as the Speaker's Conference Room, a Senator's office, or the Senate floor, she was still in a sensitive area and a sentence of incarceration is still appropriate here.

Another defendant who entered an office space, Charles Pham, received a sentence of 45 days' imprisonment. *United States v. Charles Pham,* No. 21-cr-109 (TJK). While Pham was an active-duty police officer who downplayed his conduct to the FBI, like Munn, he saw evidence of violence before entering, though he was only inside the building for approximately 20 minutes – half the time as Munn. Gov. Sentencing Mem., *Pham*, ECF No. 36, at 2.

In comparing the five defendants to one another in this case, the government is recommending the same sentence, 30 days' incarceration and 36 months' probation, for Dawn and Thomas Munn. The government is recommending a slightly lesser sentence, 21 days' incarceration and 36 months' probation, for their three children.  While the five defendants engaged in nearly the exact same behavior inside the Capitol on January 6, a slightly higher sentence is warranted for the parents in light of their encouragement and support of their family's unlawful behavior and their continuing lack of remorse.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.     This Court's Authority to Impose Sentences that Include Incarceration and Probation.

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022)

(concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS), ECF 38 (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[9] In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

---

[9] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). This Court sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

A.    **A sentence imposed for a petty offense may include both incarceration and probation.**

   *1.   Relevant Background*

   In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[10] followed by a term of probation.

   First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[11]   As a general matter, therefore, "a judge must sentence a federal offender to either a

---

[10] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

[11] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.   S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.   But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."   18 U.S.C. § 3561(a)(3).   Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).   *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."   18 U.S.C. § 3561(a)(3).   Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."   *Little*, 2022 WL

768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.
*See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to
impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be
sentenced to a period of continuous incarceration and a term of probation.  *See United States v.
Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted
of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.*
at 808.   In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)
"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term
of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal
Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in
conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the
defendant is being sentenced for a petty offense, a trial court may properly sentence such individual
to a term of continuous imprisonment for a period of time, as well as a sentence of probation.")
(citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th
ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time
to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only
"different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section
3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state
"the same *offense* or a different offense that is not a petty offense," which would imply that the
final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase
"that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section

30

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.   Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).   *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Defendant Munn pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty

offender may face a sentence of up to five years in probation).

      **B.**     **A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

          *1.  Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[12]

          *2.  Analysis*

    A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[12] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was
"not intended to carry forward the split sentence provided in Section 3561, by which the judge
imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL
25404, at *98.

of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[13]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

---

[13] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Dawn Munn to 30 days' imprisonment, three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      _____/s/_____
JENNIFER M. ROZZONI
NM Bar No. 14703
Assistant United States Attorney - Detailee
201 3rd Street, Suite 900
Albuquerque, NM 87102
Tel. No. 505-350-6818
Email: jennifer.m.rozzoni@usdoj.gov

## CERTIFICATE OF SERVICE

On this 28th day of September, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/_____
JENNIFER M. ROZZONI
Assistant United States Attorney